2002-NMCA-002

38 P.3d 181

**Larry BACA, Worker–Appellant,**

v.

**COMPLETE DRYWALL COMPANY
and USF & G Insurance Company,
Employer/Insurer–Appellees.**

**No. 21,527.**

Court of Appeals of New Mexico.

Nov. 8, 2001.

Certiorari Denied, No. 27,244, Jan. 7, 2002.

Luis Quintana, Albuquerque, NM, for Appellant.

Thomas R. Mack, Miller, Stratvert & Torgerson, P.A., Albuquerque, NM, for Appellees.

*OPINION*

FRY, Judge.

{1} In this appeal we address an issue of first impression: how long a worker can receive compensation benefits when one on-the-job injury gives rise to both (1) a disability resulting from an injury to a scheduled member pursuant to NMSA 1978, § 52–1–43 (1987), and (2) benefits paid for a permanent partial disability caused by an injury to a part of the body not covered by Section 52–1–43, *see* NMSA 1978, § 52–1–42 (1990). It is undisputed that all the disabilities are causally connected to the original on-the-job accidental injury. We hold that the number of weeks Worker received benefits for· the disabilities caused by the scheduled injuries cannot be deducted from the number of weeks he is entitled to receive benefits for his permanent partial disability. Accordingly, we reverse.

**BACKGROUND**

{2} The facts are not in dispute. Larry Baca (Worker) was employed as a drywaller for Complete Drywall Company. Complete Drywall's workers' compensation carrier is USF & G. We refer to Complete Drywall and USF & G collectively as Respondents.

{3} In November 1992, Worker fell from a scaffold and fractured his left knee joint. He underwent three separate surgeries for this injury. The leg below the hip is a scheduled member. Section 52–1–43(A)(30). Respondents paid 108.85 weeks of temporary total disability (TTD) benefits as a result of the injury to the left knee. Once Worker reached maximum medical improvement (MMI), he became entitled to an additional 150 weeks of benefits based on a 50% impairment of his left knee. *See* Section 52–1–43(D). The parties agree that these benefits have been fully paid.

{4} The injury to Worker's left knee caused him to shift his weight to his right leg. Eventually, his right knee became symptomatic and required surgery. Respondents paid TTD benefits for the disability to the right knee for a total of 43.14 weeks. Following a formal hearing, the WCJ assessed a 20% loss of use of the right knee and awarded Worker scheduled injury benefits at the rate of 20% impairment for· 150 weeks.

{5} Worker's knee problems required him to use crutches and canes while walking. As a result, in December 1997 he began to develop problems with his hands, arms, and shoulders as a result. The shoulders are not scheduled members. Respondents initially denied compensation for these complaints. However, following a mediation, Respondents began paying TTD benefits retroactive to April 24, 1998, the date of Worker's surgery

on his torn right rotator cuff. When Respondents began paying these TTD benefits, they ceased paying the scheduled injury benefits for the right knee. Consequently, for the right knee, Worker has received a total of 78.71 weeks of scheduled injury benefits at the rate of 20%.

{6} Worker eventually had surgery on his left shoulder as well and reached MMI from that surgery on March 23, 1999. At that point, his treating physician assessed an impairment to Worker's whole body. However, neither party was aware of the MMI date until December 1999. Thus, Respondents paid TTD benefits for the shoulder injuries from April 24, 1998, to December 20, 1999. On December 20, 1999, Respondents stopped paying disability benefits. Worker filed a claim for further benefits.

{7} Prior to the formal hearing, the parties stipulated that Worker had received the following benefits:

| | |
|---|---|
| TTD for the left knee | 108.85 weeks |
| Scheduled injury benefits for the left knee | 150 weeks |
| TTD for the right knee | 43.14 weeks |
| Scheduled injury benefits for the right knee | 78.71 weeks |

Thus, Worker had received benefits for the disability caused by the scheduled injuries for a total of 380.7 weeks. The parties also stipulated that Worker's percentage of permanent partial disability was 51%. This percentage was based on the disability to both shoulders and to the right knee.

{8} At the formal hearing, Worker argued that he had sustained four separate injuries: an injury to the left knee, an injury to the right knee, an injury to the left shoulder and an injury to the right shoulder. Worker argued that benefits had been fully paid for the left knee, except to the extent that Worker might become entitled to additional periods of TTD when it became necessary to completely replace that knee joint at some time in the future.

{9} Worker further argued that he first became entitled to benefits for a permanent partial disability (PPD) under Section 52-1-42 when he had the first shoulder surgery in April 1998. At that point, according to Worker, he became entitled to a maximum of 500 weeks of temporary total and permanent partial disability benefits for the whole body impairment. *See* Section 52-1-42(A)(2) (providing that a worker is entitled to receive permanent partial disability benefits for a maximum of 500 weeks if the permanent partial disability is less than 80%); Section 52-1-42(B) (providing that the 500 weeks includes the weeks for which TTD benefits were paid prior to a determination of permanent partial disability). However, Worker agreed that because the right knee was included in determining the 51% PPD percentage, Respondents should receive a week for week credit for all the weeks that benefits were paid for the right knee. In addition, Worker acknowledged that the TTD payments that began at the time of his first shoulder surgery were also included in the 500 weeks of maximum benefits. Thus, Worker agreed that Respondents had, in effect, already paid 249 out of the total 500 weeks of benefits. However, according to Worker's calculations, he was still owed an additional 251 weeks of PPD benefits at the rate of 51%.

{10} Worker argued that Section 52-1-42, the permanent partial disability section, excluded benefits paid under Section 52-1-43, the scheduled injury section. Respondents took the position that scheduled injuries were simply a "type" or "subset" of the benefits payable for permanent partial disability. Respondents argued that because there was no second on-the-job injury in this case, there was only one period during which benefits were owed and that was the 500 week period that applied to benefits for a permanent partial disability of less than 80%. According to Respondents, the period to which Worker was entitled to benefits began on the date he fell and fractured his knee and ran for 500 weeks. Respondents recognized that NMSA 1978, § 52-1-56 (1989), allowed reopening of the case when the Worker's condition changed, but argued that reopening did not "restart" the 500 week benefit period. Respondents also acknowledged that Section 52-1-43(D) provided a 700 week maximum period of benefits for a scheduled injury, but argued that this was only an authorization of additional TTD benefits for a scheduled injury.

{11} The WCJ agreed with Respondents' reading of the statutes. He added up the weeks during which Worker had received benefits and subtracted that figure from the 500 weeks available for PPD. According to the WCJ's calculations, Worker was only entitled to receive an additional 71.59 weeks of PPD benefits for the bilateral shoulder condition. In addition, after considering the dollar amount of the compensation that had been paid and was payable for all three disabilities, the WCJ determined that the inadvertent overpayment of TTD benefits had created an overpayment in a specific amount. This appeal followed.

## DISCUSSION

{12} The issues in this case are essentially issues of statutory construction. The meaning and construction of a statute is an issue of law that is reviewed de novo on appeal. *Romero Excavation & Trucking, Inc. v. Bradley Constr., Inc.*, 1996–NMSC–010, ¶ 5, 121 N.M. 471, 913 P.2d 659. This Court is not required to defer to the WCJ's interpretation of Sections 52–1–42 and 52–1–43. *Chavez v. Mountain States Constructors*, 1996–NMSC–070, ¶ 21, 122 N.M. 579, 929 P.2d 971.

{13} The critical question is the application of Sections 52–1–42 and 52–1–43 to the facts of this case. The rules of statutory construction are well-settled. "[The] primary goal is to give effect to the intent of the legislature." *Draper v. Mountain States Mut. Cas. Co.*, 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994). Initially, we examine the language of the statute, giving the words their ordinary meanings. *Id.* When the sections are part of a larger act, like the Workers' Compensation Act, "[w]e examine the act in its entirety, construing each section in connection with every other section." *Id.* We have previously held that the provisions of the Workers' Compensation Act dealing with permanent total disability, permanent partial disability, and scheduled injuries should be considered together to produce a harmonious whole. *Witcher v. Capitan Drilling Co.*, 84 N.M. 369, 372, 503 P.2d 652, 655 (Ct.App. 1972). However, in considering them together, we are required to give effect to all the language in each of those sections. *Id.; see*

also *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998–NMSC–020, ¶ 28, 125 N.M. 401, 962 P.2d 1236 ("Statutes must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)).

{14} On appeal, Worker contends that the disabilities caused by the two scheduled injuries are separate and distinct from the permanent partial disability caused by the bilateral shoulder conditions. Thus, he argues that the weeks he received benefits pursuant to the scheduled injury section were not part of the 500 weeks of benefits he is entitled to receive for his permanent partial disability. Respondents counter that it is the accident that triggers the entitlement to benefits. They argue that scheduled injuries are simply a special kind of permanent partial disability; therefore, the weeks that Worker received benefits for the disabilities caused by the injuries to his knees should be deducted from the 500 weeks that Worker would be entitled to receive PPD benefits for the disability resulting from his bilateral shoulder condition.

{15} We disagree with Respondents. It is the disability caused by the accident—not the accident itself—that triggers liability for compensation benefits. *Salinas–Kendrick v. Mario Esparza Law Office*, 118 N.M. 164, 165–66, 879 P.2d 796, 797–98 (Ct.App.1994); *Strickland v. Coca–Cola Bottling Co.*, 107 N.M. 500, 502, 760 P.2d 793, 795 (Ct.App.1988). Generally, a worker becomes disabled on the day the accident occurs. That was the case with the disability to Worker's left knee. However, when there is a delay between the accident and the resulting disability, as occurred with Worker's right knee and the bilateral shoulder condition, entitlement to compensation begins on the date of the disability rather than the date of the accident. *Salinas–Kendrick*, 118 N.M. at 165–66, 879 P.2d at 797–98; *Strickland*, 107 N.M. at 502, 760 P.2d at 795. This conclusion is consistent with the statutory requirement that, in order to establish a right to compensation, a worker must show "(1) . . . the worker has sustained an accidental injury arising out of and in the course of his employment; (2) . . . the accident was

reasonably incident to his employment; and (3) ... *[the] disability is a natural and direct result of the accident.*" NMSA 1978, § 52–1–28(A) (1987) (emphasis added).

{16} Respondents argued below that because there was only one work-related accident—the fall from the scaffold—there was only one benefit period. Respondents confuse the concepts of a work-related accidental injury, an injury in general, and a disability. We agree with Respondents that in order to be entitled to compensation, a worker must prove that he suffered an on-the-job accidental injury. Frequently, the injury will occur suddenly like Worker's fall from the scaffold. However, an injury may also be a gradual breakdown of a part of the body. *Lyon v. Catron County Comm'rs*, 81 N.M. 120, 125, 464 P.2d 410, 415 (Ct.App. 1969). Worker's right knee and his shoulders appear to have gradually broken down. Worker does not have to show that these delayed injuries occurred while he was working. Instead, he must show that the resulting disability is causally connected to the original accidental injury-the fall that fractured his left knee.

{17} The distinction is illustrated by *Aragon v. State of N.M. Corr. Dep't*, 113 N.M. 176, 824 P.2d 316 (Ct.App.1991). The worker in that case suffered a herniated L5 S1 disk as a result of an on-the-job accident for which he received benefits. He ultimately recovered and returned to work without restrictions. Five years later, the worker injured his back a second time while working on his personal vehicle in his garage. He argued that this was an aggravation of his original back injury. However, the WCJ found that the disability caused by the worker's second back injury was not a natural or direct progression of the original injury. We affirmed the ruling on appeal, holding:

> Under our interpretation of the statute, a worker is entitled to benefits for disability arising immediately from a work-related accident and for disability that develops later as a result of the normal activities of life.

*Id.,* at 179, 824 P.2d at 319.

{18} Similarly, in *Gomez v. Bernalillo County Clerk's Office*, 118 N.M. 449, 882 P.2d 40 (Ct.App.1994), the worker fell at work, fracturing her left wrist and shattering her right elbow. About three months later, she fell at home and injured her shoulder. She sought additional benefits for the disabilities caused by the shoulder injury. The WCJ denied benefits, finding that disabilities arising out of the second fall were not compensable. We affirmed, holding that the shoulder condition was the result of an accidental fall at home that was not caused by the disability to the left wrist and right elbow.

{19} In contrast to *Aragon* and *Gomez*, there is no dispute in the present case that Worker's subsequent bilateral shoulder condition resulted from the progression of Worker's original injury. Therefore, Worker suffered multiple disabilities from one on-the-job accidental injury.

{20} Respondents also argued below that benefits for disabilities resulting from scheduled injuries are simply a special form of benefits for permanent partial disabilities. This argument ignores case law concerning the difference between the two concepts. Although many of the cases on the issue were decided under the law as it existed prior to 1990, their discussions of the scheduled injury section remain viable today. Under the law at that time:

> The scheduled injury section does not take into consideration the occupation of the worker and how the loss of the specific member of the body may affect his or her ability to perform the duties of his or her job. The schedule, for example, awards the same benefit to a piano player as to a night watchman for the loss of a finger, hand or arm.

*Hise Constr. v. Candelaria*, 98 N.M. 759, 760, 652 P.2d 1210, 1211 (1982). Thus, a worker could receive scheduled injury benefits even if he was not "disabled," as that term was defined under prior law.

{21} On the other hand, a worker was entitled to permanent partial disability benefits instead of scheduled injury benefits if the worker could show that the injury to the scheduled member caused a separate and distinct injury to a non-scheduled body part. *Id.; see also Jurado v. Levi Strauss & Co.,*

120 N.M. 801, 804, 907 P.2d 205, 208 (Ct.App. 1995). Moreover, if the injury to the scheduled member left the worker totally disabled as defined by the Act, he was entitled to benefits for total disability even though he could not show that the injury to the scheduled member caused a separate and distinct injury to a non-scheduled body part. *Witcher*, 84 N.M. at 371–73, 503 P.2d at 654–56; *Hise Constr.*, 98 N.M. at 760, 652 P.2d at 1211. Thus, we agree with Worker that disabilities caused by scheduled injuries and disabilities caused by injuries to non-scheduled members are separate and distinct concepts.

{22} We now examine the statutes defining each type of disability. Permanent partial disability is defined and the degree of disability is calculated pursuant to NMSA 1978, §§ 52–1–26 (1987, as amended through 1990), –26.1 (1990), –26.2 (1990, as amended through 2001), –26.3 (1990, as amended through 2001) and –26.4 (1990). The amount and duration of benefits payable for permanent partial disability is defined by Section 52–1–42:

> A. For permanent partial disability, the workers' compensation benefits not specifically provided for in Section 52–1–43 NMSA 1978 shall be a percentage of the weekly benefit payable for total disability as provided in Section 52–1–41 NMSA 1978. The percentage of permanent partial disability shall be determined pursuant to the provisions of Sections 52–1–26 through 52–1–26.4 NMSA 1978.

Subsection A then goes on to provide a different duration of benefits for each of the following: (1) permanent partial disability of 80% or more; (2) permanent partial disability of less than 80%; (3) permanent partial disability as the result of a primary mental impairment; and (4) permanent partial disability as the result of a secondary mental impairment. In this case, Worker is 51% permanently partially disabled and therefore is entitled to a maximum benefit period of 500 weeks. In addition, Section 52–1–42(B) explicitly provides for the treatment of temporary total disability benefits as follows:

> B. If an injured worker receives temporary total disability benefits prior to an award of partial disability benefits, the maximum period for partial disability benefits shall be reduced by the number of weeks the worker actually receives temporary total disability benefits.

{23} Benefits for disabilities caused by injuries to specific body members, commonly referred to as scheduled injuries, and the amount and duration of those benefits are set out in Section 52–1–43:

> A. For disability resulting from an accidental injury to specific body members, including the loss or loss of use thereof, the worker shall receive the weekly maximum and minimum compensation for disability as provided in Section 52–1–41 NMSA 1978 . . . .

Subsection 52–1–43(A) goes on to list forty-three distinct injuries to specific body members or functions and states the number of weeks that compensation shall be paid for each. The statute also provides that benefits for partial loss of use "shall [be] computed on the basis of the degree of such partial loss of use." Section 52–1–43(B). In addition, Section 52–1–43(D) provides that temporary total disability benefits may be paid for a disability caused by injury to a scheduled member *in addition to* the weeks for which benefits are to be paid for under Subsections 52–1–43(A) and (B), up to a maximum of 700 weeks. The longest duration of benefits for a scheduled injury contemplated by Subsections 52–1–43(A) and (B) is 200 weeks. Therefore, a worker could conceivably receive 500 or more weeks of TTD benefits in addition to his scheduled injury benefits for disability resulting from injury to a scheduled member.

{24} It is clear that the Act treats scheduled injury benefits and PPD benefits differently. Contrary to Respondents' contention, the statutes do not define the duration and amount of benefits for a particular accident; they define the duration and amount of benefits for a particular type of disability that is causally connected to a work-related accident. Section 52–1–42 provides the amount and duration of benefits for a partial disability as defined in Sections 52–1–26 through 26.4. It explicitly excepts from its purview disabilities covered by Section 52–1–43. Sec-

tion 52–1–43 provides the amount and duration of benefits for disabilities caused by injuries to specific body members or functions. Each section addresses the effect of temporary total disability payments for such disabilities on the duration of the benefits provided for that disability. Nothing in the language of either statute indicates that benefits under Section 52–1–43 are somehow part of the benefits payable under Section 52–1–42. On the contrary, each section provides for the duration of benefits for the type of disability covered by that section.

{25} Respondents argue that the weeks of TTD benefits paid in connection with both of Worker's scheduled injuries ought to be deducted from the weeks of PPD benefits payable for the disability caused by the bilateral shoulder condition. Respondents base this argument on the language in Section 52–1–42(B) which provides that payments of temporary total disability "prior to" an award of permanent partial disability shall be included in the 500 weeks of benefits for a permanent partial disability. However, the scheduled injuries section and the permanent partial disability section each address separately the extent to which TTD benefits are to be included in determining the duration of the respective benefits. We see no reason to include the weeks of TTD received in connection with a scheduled injury in calculating the weeks that a worker may receive permanent partial disability benefits.

{26} Respondents argued below that the interpretation we adopt today will, in effect, restart the period during which benefits are to be paid every time a condition is aggravated. We emphasize that this is not the intended effect of our ruling. This case does not involve an aggravation of the condition of Worker's left knee; it involves a disability to the left knee that subsequently caused a disability to the right knee and later a permanent partial disability based on injuries to the shoulders.

## CONCLUSION

{27} In summary, we reverse the compensation order. We remand for entry of an order awarding Worker an additional 251 weeks of permanent partial disability benefits at the rate of 51%. In addition, on remand, the WCJ shall determine the amount of fees to be awarded to Worker for the services of his attorney in connection with this appeal.

{28} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, Judge, JAMES J. WECHSLER, Judge.