This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**RICKY D. CASE,**

Worker-Appellee/Cross-Appellant,

v.                                                        **NO. 34,934**

**HANNA PLUMBING & HEATING CO., INC.**
**and MECHANICAL CONTRACTORS**
**ASSOCIATION OF NEW MEXICO, INC.**
**WORKERS' COMPENSATION GROUP FUND,**

Employer/Insurer-Appellants/Cross-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Leonard J. Padilla, Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Appellee

Maestas & Suggett, P.C.
Paul Maestas
Albuquerque, NM

for Appellants

## MEMORANDUM OPINION

**SUTIN, Judge.**

{1} Employer includes Appellants Hanna Plumbing & Heating Co., Inc. and Mechanical Contractors Association of New Mexico Inc. Workers' Compensation Group Fund. Worker is Cross-Appellant Ricky D. Case. In this Workers' Compensation Act (the Act) appeal, Employer raises a first impression issue whether the workers' compensation judge's (WCJ's) awards of both permanent partial disability (PPD) benefits, under NMSA 1978, Section 52-1-42 (1990, amended 2015), and scheduled injury disability benefits, under NMSA 1978, Section 52-1-43 (2003), improperly duplicated Worker's benefits. Employer also asserts that the WCJ erred in the start date for Worker's PPD benefits. Worker cross-appeals, asserting error in the assessments of his (1) total impairment rating, (2) impairment at a less than additive value through the "combined values" methodology, and (3) tort damages in assessing Employer's reimbursement rights. For the reasons discussed later in this opinion, we reverse and remand for further proceedings as stated in our conclusion at the close of this opinion.

**BACKGROUND**

{2} Worker sustained serious injuries to both of his feet and ankles in a March 17, 2010 accident. He underwent a right subtalar joint fusion in February 2011 and a left subtalar joint fusion in June 2011. He later developed low back, left hip, and right knee pain and depression issues, all attributable to the accident. He reached maximum

2

medical improvement (MMI) on different dates: foot/ankle on June 13, 2012; depression (secondary mental impairment) on February 7, 2013; and low back, left hip, and right knee injuries on January 2, 2014. Worker's claims were tried in November 2014, and the WCJ filed his compensation order in July 2015.

**{3}** As to temporary total disability (TTD) benefits, the WCJ determined that Worker was entitled to TTD benefits from his March 17, 2010 accident until he reached MMI on January 2, 2014. There exists no issue on appeal regarding these benefits. Employer was entitled to and appears to have received appropriate credit for all TTD benefits paid.

**{4}** The WCJ determined that "Worker suffered a combined 24% whole person impairment [(WPI)] as a result of his accident: 8% for left lower extremity; 8% for right lower extremity; 3% for altered gait[;] and 10% for secondary mental." The WCJ also determined that "Worker did not suffer permanent physical impairment to his low back, hips, and right knee." The WCJ determined that Worker was entitled to 56% PPD benefits for 500 weeks from January 2, 2014. As to Worker's foot/ankle scheduled injuries, the WCJ awarded benefits of 70% based on "70% loss of use for his left foot/ankle injury[,]" and 70% based on "70% loss of use for his right foot/ankle injury."

3

{5}    Worker filed a third-party tortfeasor action and settled for $1,850,000. The WCJ valued Worker's personal injury case at $3,300,000, resulting in Worker receiving 56% of the amount he needed to make him whole as determined by the WCJ.

**DISCUSSION**

**A.    Liberal Construction Issue**

{6}    Raised by Worker, the parties argue about the liberality with which this Court should address issues involving benefits to workers under the Act. Worker asserts in his answer brief that we must apply a rule of liberal construction to effectuate the benevolent purposes of the Act.[1] Employer contends that Worker's "pre-1990 liberal construction analysis . . . effectively invites this Court to ignore the clear pronouncement of the New Mexico Legislature in revising the . . . Act in 1990." *See* NMSA 1978, § 52-5-1 (1990). Section 52-5-1 states a legislative "specific intent"

> that benefit claims cases be decided on their merits and that the common law rule of "liberal construction" based on the supposed "remedial" basis of workers' benefits legislation shall not apply in these cases. The workers' benefit system in New Mexico is based on a mutual renunciation of common law rights and defenses by employers and employees alike. Accordingly, the [L]egislature declares that the . . . Act

---

[1] Worker relies on our Supreme Court's cases of *Mascarenas v. Kennedy*, 1964-NMSC-179, ¶¶ 3-4, 74 N.M. 665, 397 P.2d 312; *Dupper v. Liberty Mutual Insurance Co.*, 1987-NMSC-007, ¶ 5, 105 N.M. 503, 734 P.2d 743; *Michaels v. Anglo American Auto Auctions, Inc.*, 1994-NMSC-015, ¶ 13, 117 N.M. 91, 869 P.2d 279; and *Benavides v. Eastern New Mexico Medical Center*, 2014-NMSC-037, ¶ 44, 338 P.3d 1265.

. . . [is] not remedial in any sense and [is] not to be given a broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand.

*Id.* Employer adds that Worker invites this Court to ignore this Court's own pronouncements[2] calling for evenhandedness and fundamental fairness for both Worker and Employer. Employer states that the notion of liberal construction "is a thing of the past."

{7}    Our Supreme Court's latest pronouncement along the line of liberal construction is found in *Rodriguez v. Brand West Dairy*, 2016-NMSC-029, 378 P.3d 13. The Court stated the Act's objective as: "(1) maximizing the limited recovery available to injured workers, in order to keep them and their families at least minimally financially secure; (2) minimizing costs to employers; and (3) ensuring a quick and efficient system." *Id.* ¶ 12 (internal quotation marks and citation omitted). According to *Rodriguez*, "[t]he Act also instructs that it is not to be given a broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand." *Id.* (internal quotation marks and citation omitted).

---

[2] *Garcia v. Mt. Taylor Millwork, Inc.*, 1989-NMCA-100, ¶ 11, 111 N.M. 17, 801 P.2d 87; *Ramirez v. Dawson Production Partners, Inc.*, 2000-NMCA-011, ¶ 8, 128 N.M. 601, 995 P.2d 1043; and *Gurule v. Dicaperl Minerals Corp.*, 2006-NMCA-054, ¶ 9, 139 N.M. 521, 134 P.3d 808.

5

**{8}** Turning to language in *Salazar v. Torres*, 2007-NMSC-019, ¶ 10, 141 N.M. 559, 158 P.3d 449, the Court in *Rodriguez* also stated that "[Section 52-5-1] requires us to balance equally the interests of the worker and the employer without showing bias or favoritism toward either." *Rodriguez*, 2016-NMSC-029, ¶ 12 (internal quotation marks and citation omitted). Under *Salazar*, courts are to consider "policy and philosophy that inform the legislative intent behind the Act[.]" 2007-NMSC-019, ¶ 9. The policy is one of "evenhandedness." *Id.* ¶¶ 10-11.

**{9}** We follow the Section 52-5-1 mandate that we are not to engage in a broad liberal construction of the Act in favor of an employer or a worker. We will balance their interests "without showing bias or favoritism toward either." *Rodriguez*, 2016-NMSC-029, ¶ 12 (internal quotation marks and citation omitted). And we will apply "evenhandedness," *Salazar*, 2007-NMSC-019, ¶¶ 10-11, as well as "fundamental fairness to both the worker and the employer[.]" *Gurule*, 2006-NMCA-054, ¶ 9. Still, "[w]e do not favor constructions of the Act that limit a worker's ability to recover for the full extent of his or her injuries. . . . [A] worker should be fairly compensated for the full extent of his or her injuries." *Gutierrez v. Intel Corp.*, 2009-NMCA-106, ¶¶ 15-16, 147 N.M. 267, 219 P.3d 524.

**B.    Employer's Appeal: Double-Benefit Issue**

{10} Employer faults the WCJ for awarding PPD benefits to Worker based on an impairment calculation emanating from Worker's foot/ankle injuries, while at the same time awarding benefits for the foot/ankle disabilities as scheduled injuries. According to Employer, this improperly resulted in a commingling of scheduled and non-scheduled injuries that required Employer to pay Worker twice for the same injuries in conflict with this Court's decisions in *Gutierrez* and *Baca v. Complete Drywall Co.*, 2002-NMCA-002, 131 N.M. 413, 38 P.3d 181, each, according to Employer, having determined that scheduled injuries are separate and distinct from non-scheduled injuries. *See Gutierrez*, 2009-NMCA-106, ¶ 12; *Baca*, 2002-NMCA-002, ¶ 21. The issue raised by Employer requires interpreting various provisions of the Act. Any review therefore is de novo. *DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 13, 146 N.M. 453, 212 P.3d 341; *Baca*, 2002-NMCA-002, ¶ 12. We first discuss *Baca* and *Gutierrez*, and next the parties' arguments, followed by our conclusion to reverse and remand for further proceedings as stated in our conclusion at the close of this opinion.

{11} Preliminarily, concepts of impairment, permanent impairment, PPD, and the determination of PPD through calculation of impairment as modified by age, education, and physical capacity, and the subject of compensation benefits for PPD, are contained in NMSA 1978, Sections 52-1-24 (1990), 52-1-26 (1990, amended

7

2017), and Section 52-1-42. Benefits for specifically scheduled member injuries, based on disability, including loss or loss of use of specific body members, are contained in Section 52-1-43. Those scheduled injuries are compensated over a set number of weeks, and the benefits for a partial loss of use are "computed on the basis of the degree of such partial loss of use[.]" Section 52-1-43(A), (B). Section 52-1-42(A) covers PPD "benefits not specifically provided for in Section 52-1-43[.]" Section 52-1-42(B) states that "[PPD] benefits shall be reduced by the number of weeks the worker actually receives [TTD] benefits" for the covered injuries. Differently, for scheduled injuries, a worker is entitled to TTD payments up to MMI and, in addition, is entitled to scheduled injury disability benefits related to the particular scheduled injury. *See* § 52-1-43(D); *Baca*, 2002-NMCA-002, ¶ 23. Benefits for scheduled injury disability under Section 52-1-43 are not part of the benefits for non-scheduled injury disability under Section 52-1-42. *See Baca*, 2002-NMCA-002, ¶ 24. "Benefits for disabilities caused by injuries to specific body members . . . and the amount and duration of those benefits are set out in Section 52-1-43[.]" *Baca*, 2002-NMCA-002, ¶ 23.

{12}     In *Baca*, this Court addressed the question of "first impression [regarding] how long a worker can receive compensation benefits when one on-the-job injury gives rise to both (1) a disability resulting from an injury to a scheduled member[,] pursuant

8

to NMSA 1978, [Section] 52-1-43 (1987[, amended 2003]), and (2) benefits paid for a [PPD] caused by an injury to a part of the body not covered by Section 52-1-43[.]" *Baca*, 2002-NMCA-002, ¶ 1. *Gutierrez* addressed the same issue under slightly different facts. 2009-NMCA-106, ¶¶ 1-3, 13.

**{13}** *Baca* involved "a disability to the left knee that subsequently caused a disability to the right knee and . . . injuries to the shoulders." 2002-NMCA-002, ¶ 26. The worker received both TTD and scheduled injury benefits for the left and right knee injuries. *Id.* ¶ 7. His bilateral shoulder injuries constituted non-scheduled injuries that stemmed from his knee problems. *Id.* ¶¶ 5, 19. The worker received TTD benefits for the shoulders. *Id.* ¶¶ 5-6. After surgery to the worker's second shoulder, the treating physician assessed impairment to the worker's whole body. *Id.* ¶ 6. The WCJ appears to have determined the worker's percentage of PPD to be 51% based on the disability to one or both shoulders and the right knee. *Id.* ¶¶ 7, 9.

**{14}** *Baca* draws on earlier law[3] as still applicable, namely, that "[the] worker was entitled to [PPD] benefits instead of scheduled injury benefits if the worker could show that the injury to the scheduled member caused a separate and distinct injury to a non-scheduled body part." *Id.* ¶ 21. And *Baca* "agree[d] with [the w]orker that

---

[3] *See Jurado v. Levi Strauss & Co.*, 1995-NMCA-129, 120 N.M. 801, 907 P.2d 205; *see also Hise Constr. v. Candelaria*, 1982-NMSC-109, 98 N.M. 759, 652 P.2d 1210; *Witcher v. Capitan Drilling Co.*, 1972-NMCA-145, 84 N.M. 369, 503 P.2d 652.

disabilities caused by scheduled injuries and disabilities caused by injuries to non-scheduled members are separate and distinct concepts." *Id.*

{15} Focusing on duration of benefits for the different types of disability, *id.* ¶¶ 22-25, *Baca* states that "[n]othing in the language of either [Section 52-1-42 or Section 52-1-43] indicates that benefits under Section 52-1-43 are somehow part of the benefits payable under Section 52-1-42. On the contrary, each section provides for the duration of benefits for the type of disability covered by that section." *Id.* ¶ 24.

{16} Further, under *Baca* "the scheduled injuries section and the [PPD] section each address separately the extent to which TTD benefits are to be included in determining the duration of the respective benefits." *Id.* ¶ 25. Thus, the weeks of TTD received in connection with a scheduled injury are not to be counted among the weeks that a worker may receive PPD benefits.

{17} *Gutierrez* involved an injury in 1996 to the worker's left foot and back. 2009-NMCA-106, ¶ 4. Evidence showed "consistent foot, leg, and back pain, and his progressive decline[.]" *Id.* He had several foot surgeries during 1998 through November 2001. *Id.* ¶ 5. The worker developed low back and left leg pain and was diagnosed with "degenerative disc disease and other spinal problems" in 2000 and 2001. *Id.* ¶ 6. In 2002, when the worker complained of left back, foot, and hip pain, an MRI showed spondylolisthesis at L5-S1, and also "spondylolysis, a fracture in the

back part of the spine." *Id.* ¶ 7. By November 2004, the worker still had pain radiating down his leg, and continued low back pain and left leg nerve pain. *Id.* "By March 2005, it was hard for [him] to walk by the end of the afternoon." *Id.* A physician connected the worker's back and leg pain to the 1996 accident. *Id.* ¶ 8. After back surgery, the worker's disc was stable, and the worker reached MMI in May 2006. *Id.* The worker's pain continued. *Id.* ¶ 9.

{18}     The WCJ in *Gutierrez* combined durations of the foot and back injuries and awarded 615 weeks of benefits, *id.* ¶ 10, noting that in *Baca* the Court "allowed the worker to recover more than 500 weeks in benefits." *Gutierrez*, 2009-NMCA-106, ¶ 12. *Gutierrez* recognized that the worker's injuries all occurred at the time of the accident, whereas in *Baca*, the injuries at the time of the accident "later caused the shoulder problems." *Gutierrez*, 2009-NMCA-106, ¶ 13. Nevertheless, *Gutierrez* focused on the "benefit period" for benefits, saw no reason to distinguish *Baca*, and rejected the employer's contention that "[the w]orker's benefits period should be limited to 500 weeks." *Gutierrez*, 2009-NMCA-106, ¶¶ 14, 16.

{19}     *Livingston v. Environmental Earthscapes*, 2013-NMCA-099, ¶¶ 1, 3, 311 P.3d 1196, involved the issue whether a worker could be paid PPD and scheduled injury loss of use benefits when the payments for both would exceed the worker's average weekly wage. The critical question involved interpretation of various sections of the

11

Act, including NMSA 1978, Section 52-1-47.1(A) (1990), that limited benefits "so that no worker receives more in total payments . . . by not working than by continuing to work." *See Livingston*, 2013-NMCA-099, ¶¶ 4-9. This Court noted that the worker relied on *Baca* and *Gutierrez* to support his position that he could receive benefits in excess of his average weekly wage. *Livingston*, 2013-NMCA-099, ¶ 10. We determined that neither case supported the worker's position, given that the issues in *Baca* and *Gutierrez* were different from the issue in *Livingston*. *Livingston*, 2013-NMCA-099, ¶ 10. We recognized that the issue was not whether the benefits were separate and distinct, but instead whether the worker was entitled to "recover more in benefits on a weekly basis than he was earning prior to the accident." *Id.*

**1.       The Parties' Arguments (Double-Benefit Issue)**

{20}     Employer sees the question left unanswered by *Gutierrez* and *Baca* to be "how [are] an injured worker's entitlement to [PPD] benefits and scheduled injury benefits calculated/determined when the scheduled and non-scheduled injury benefits overlap and exist contemporaneously[?]" Employer asserts that the separation and distinction required by *Baca* and *Gutierrez* "give[s] rise to separate and distinct entitlements to permanent disability benefits and corresponding time periods of benefit entitlement." Thus, Employer concludes, "[i]n using the foot/ankle and gait impairments . . . in calculating . . . Worker's PPD award, the WCJ has, in effect, awarded . . . Worker both

scheduled injury and PPD benefits for his foot/ankle injuries—something *Baca* and *Gutierrez* say [is] improper."

{21}     Employer further argues that to duplicate the award in that manner "effectively elevates the rights of . . . Worker above those of Employer/Insurer" in disregard of our Legislature's mandate that the rights of the worker and the employer are to be "subject to the same standard of conduct and equivalent consequences for misconduct" under *Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, ¶ 1, 131 N.M. 272, 34 P.3d 1148, and Section 52-5-1. Employer points out that, in *Delgado*, our Supreme Court noted that "the Act provides a scheme of compensation that affords profound benefits to both workers and employers" and "represents the result of a bargain struck between employers and employees[,]" and that "[t]his bargain is based on a mutual renunciation of common law rights and defenses by employers and employees[.]" 2001-NMSC-034, ¶ 12 (internal quotation marks and citations omitted). And Employer repeats *Delgado*'s emphasis that, under Section 52-5-1, courts are precluded "from interpreting the Act in any way that would favor either the worker or the employer." *Delgado*, 2001-NMSC-034, ¶ 17.

{22}     Worker devotes a major part of his answer brief to express his disdain with respect to the insurance industry's efforts for and the Legislature's adoption of the 1990 amendments to the Act. He complains about the sweeping legislative changes

redefining permanent total disability and PPD in ways that permanent total disability benefits were all but extinguished, leaving workers with "minimal dependence on compensation awards." In Worker's words, the amendments "drastically 'reformed' the Act as a result of an alleged 'Insurance Crisis' " and further "ignored" and "disemboweled" the "benevolent purpose for enacting [workers' compensation] legislation" in order to overcome the mythological industry crisis.

{23}     According to Worker, this ultimately resulted—with Worker's apologies to Shakespeare's *Hamlet*—in "something . . . rotten in the State of New Mexico—two and one-half decades of [workers' compensation] insurers reaping profits from a state[-]mandated insurance program while heaping the real costs onto the taxpayers[,]" while "disabled workers became the sacrificial lamb for a vibrant economy." The ultimate point of Worker's multi-page lesson that he characterizes as "[Workers' Compensation] Economics 101" is that no "insurance crisis" ever actually existed and "[t]he New Mexico Legislature had been played for a fool."

{24}     We leave Worker's course in Economics 101 for the classrooms of our Supreme Court and the Legislature. Getting to the merits of the issue, Worker asserts that no duplication of benefits exists in this case. He argues that "[t]he scheduled injury section was essentially enacted to provide limited compensation to an injured worker who was not disabled but who nevertheless sustained a work-related permanent injury

14

for which some compensation was due." He sees impairment as measured differently from loss of use, because "impairment does not equal loss of use." Based on his position that non-scheduled injury and PPD can arise from a scheduled member injury and disability, he argues that the basic holdings in *Baca* and *Gutierrez* amount to a view "that scheduled injury benefits stand alone, separate and distinct from PPD benefits [for WPI,] and if both [scheduled injury] and PPD benefits are warranted, workers are to be awarded both sets of benefits independent of each other." Worker weaves language similar to that used by Employer into an argument opposite that of Employer. According to Worker, separateness allows benefits for certain injuries to be awarded as both PPD and scheduled member loss of use.

{25}    Worker additionally sees the WCJ's determination as correctly conforming to a view that, in calculating a worker's impairment as modified by age, education, and physical capacity, Section 52-1-26(C) does not allow a WCJ to exclude any impairments that may stem from injuries listed in Section 52-1-43. Section 52-1-26(C) reads:

> [PPD] shall be determined by calculating the worker's impairment as modified by his age, education and physical capacity, pursuant to [NMSA 1978,] Sections 52-1-26.1 [to] 52-1-26.4 [(1990, as amended through 2015)]; provided that, regardless of the actual calculation of impairment as modified by the worker's age, education and physical capacity, the percentage of disability awarded shall not exceed ninety-nine percent.

15

In that regard, Worker states that "impairment," as defined in Section 52-1-24, "is not defined as a worker's whole[-]body impairment exclusive of any contribution from scheduled members." Section 52-1-24(A) reads:

> "impairment" means an anatomical or functional abnormality existing after the date of [MMI] as determined by a medically or scientifically demonstrable finding and based upon the most recent edition of the American [M]edical [A]ssociation's guide to the evaluation of permanent impairment or comparable publications of the American [M]edical [A]ssociation. Impairment includes physical impairment, primary mental impairment and secondary mental impairment[.]

{26}     Worker argues that had the Legislature intended to define "impairment" as Employer argues, that is, as excluding the contribution of a scheduled injury to partial disability, it would have said so somewhere within Section 52-1-24 or Section 52-1-26. Worker also points to NMSA 1978, Section 52-1-25(A)(2) (2003) that specifically includes traumatic brain injuries in the definition of "permanent total disability" while declaring that permanent total disability means "a brain injury . . . exclusive of the contribution to the impairment rating arising from any other impairment to any other body part, or any preexisting impairments of any kind[.]" Thus, Worker's interpretation of the benefits statutes is that the WCJ properly calculated Worker's WPI by including Worker's foot/ankle injuries and gait impairments, while still awarding scheduled injury benefits based on 70% loss of use of Worker's ankles, and

16

"[a]ccordingly, there was no duplication of the [scheduled injury] award within the PPD award."

**{27}** Additionally, Worker points to Section 52-1-26.4, which covers physical capacity modification within the PPD formula, looking at various classifications of work in terms of "heavy, medium, light, and sedentary." Worker points out that nothing in Section 52-1-26.4 directs a WCJ to exclude from PPD consideration of any injuries that come within the physical capacity determination in PPD analyses, and thus "[b]y including factors such as walking, standing, arm controls[,] and leg controls, it stands to reason that the Legislature specifically intended that a WCJ consider injuries to arms, legs, and feet in assessing physical capacity modification." *See* § 52-1-26.4(C)(1), (2) (discussing lifting); § 52-1-26.4(C)(3) (discussing "arm or leg controls"). Worker concludes that the WCJ did not err by considering in PPD the limitations imposed by the injuries to Worker's feet and ankles, as well as his knee, hips, and low back.

**{28}** In response to Employer's argument that the only impairment that was not related to Worker's feet/ankle injuries was for mental impairment and that such an impairment does not justify a loss of physical capacity, Worker asserts that Dr. Anthony Reeve gave Worker a 3% whole-person pain impairment rating due to chronic pain that included his hip and back pain and because Worker "has a

17

significant gait pattern abnormality because of his pain." Thus, according to Worker, "the WCJ's decision to award modifier benefits based upon a loss of physical capacity from heavy to sedentary was due to Worker's 'significant gait pattern abnormality' due to his 3% WPI due to chronic pain."

{29} In sum, according to Worker, the WCJ properly assessed scheduled injury benefits through a partial loss of use analysis and also properly assessed Worker's PPD benefits through the "statutory mandated factors[,]" without any double recovery of any benefits.

{30} Employer discards Worker's argument that Section 52-1-26(C) does not allow a WCJ to exclude any impairments in performing a PPD calculation as meaningless and irrelevant given this Court's holdings in *Gutierrez* and *Baca*, as well as a logical reading of that section as referencing only PPD benefits and not an impairment related to a scheduled injury. Employer equally discards Worker's argument that the WCJ did not consider the 70% loss of use to Worker's feet in awarding PPD benefits, stating that a difference in the wording does not eliminate the fact of getting paid twice for the same thing is a duplication process and is inconsistent with *Gutierrez* and *Baca*.

**2.      Summary Conclusions (Double-Benefit Issue)**

**a.      TTD but No PPD**

**{31}** We are not adequately made aware for what TTD benefits were paid, for what period of time these benefits were paid for each injury, and as to specifically what Employer was credited. Nor are we adequately made aware of the factual and authoritative bases as to what the PPD for 500 weeks starting January 2, 2014 was attributed, or why the 500 weeks was not reduced by TTD paid. And we are not adequately made aware of why, after TTD was paid for Worker's low back, hip, and right knee injuries up to MMI on January 2, 2014, the WCJ determined that none of these injuries (presumably disabilities) resulted to some percentage extent in PPD.

**b.   WPI Ratings**

**(1)   The 8% Ratings**

**{32}** We are given insufficient information as to how and why the WCJ determined that Worker suffered a 24% WPI that consisted in part of 8% attributed for the left lower extremity and 8% attributed for the right lower extremity. One cannot discern what specific unscheduled parts of Worker's body were partially permanently impaired constituting WPI. The 8% determinations appear to refer to the two foot/ankle scheduled injuries. The only unscheduled impairments to possibly be included in these 8% ratings were the low back, hip, and right knee injuries, each of which the WCJ determined did not give rise to WPI and PPD (although the right knee injury would necessarily have been a scheduled injury).

19

**{33}** If, the WCJ intended the combined 8% / 8% WPI and PPD as additional benefits unconnected with any specific separate unscheduled impairment, but instead was connecting these benefits with the scheduled foot/ankle injuries, this combined 16% rating appears to run afoul of Section 52-1-42(A)'s language that "[f]or [PPD], the workers' compensation benefits not specifically provided for in Section 52-1-43 . . . shall be a percentage of the weekly benefit payable for total disability[.]" The combined 16% rating might also run afoul of the separateness analyses in *Gutierrez* and *Baca*, although the application of these cases to the present one involves a process in search of a reasoned interpretation. We are not adequately made aware of the analyses and the factual, legal, and authority bases underlying the combined 16% rating.

**(2)    The 3% Rating**

**{34}** The WCJ's 3% rating attributed to gait is apparently attributable to the WCJ's view that it is an impairment constituting PPD as a specific, later developed injury caused by Worker's foot/ankle disabilities. *See Baca*, 2002-NMCA-002, ¶¶ 19, 21, 26-27 (stating that "disabilities caused by scheduled injuries and disabilities caused by injuries to non-scheduled members are separate and distinct concepts[,]" yet, in reversing a WCJ order that erroneously subtracted scheduled injury benefit weeks from PPD benefit weeks, the Court appears not to have disturbed a PPD rating for a

condition that developed from the scheduled knee injury). We are not adequately made aware of the analyses and the factual, legal, and authority bases underlying this 3% rating.

**(3)    The 10% Rating**

{35}    Questions surrounding the WCJ's 10% PPD rating for Worker's secondary mental impairment appear to be somewhat similar to those relating to the gait PPD, insofar as the possibility of a PPD rating for a WPI stemming from a specific body member may exist under the Act. Although, different from a gait condition, secondary mental impairment is specifically addressed in Section 52-1-42(A)(4) as to the duration of benefits for "partial [permanent] disability result[ing] from a secondary mental impairment[.]" "Secondary mental impairment" is defined in Section 52-1-24(C) as meaning "a mental illness resulting from a physical impairment[,]" as opposed to "primary mental impairment" as defined in Section 52-1-24(B) to mean "a mental illness arising from an accidental injury arising out of and in the course of employment when the accidental injury involves no physical injury[.]" In the WCJ's compensation order, the extent of the WCJ's focus on secondary mental impairment was solely to find that Worker reached MMI for secondary mental impairment on February 7, 2013 and suffered 10% WPI "for secondary mental," and to conclude that this impairment was caused by Worker's foot/ankle injuries. We are not adequately

made aware of the analyses and the factual, legal, and authority bases underlying this 10% rating.

{36}    Needless to say, the issue here tests the intended breadth and coverage of the *Gutierrez* and *Baca* separate-and-distinct analyses and pronouncements in regard to PPD and scheduled injury benefits and the intent underlying the statutory provisions relating to those benefits. Neither *Gutierrez* nor *Baca*, nor relevant earlier decisions, directly address the precise point of whether a worker can receive scheduled injury benefits for loss of use of a scheduled body member and also PPD benefits stemming from the same scheduled body member injuries.

{37}    The WCJ and counsel do not provide this Court with a clear path to effective review and a reasoned resolution of the double benefit issue. The WCJ's WPI determinations are not supported by clearly articulated, specific factual analyses nor by case and statutory interpretation or application that has been sufficiently developed in the record to allow an effective appellate review. The briefs do not adequately assist. Although instructive, *Gutierrez* and *Baca* do not directly address and answer the question here. The WCJ's determinations are problematic and the matter is in need of remand.

**c.    In Sum**

**{38}** Given that we are not adequately made aware of the WCJ's underlying bases for his determinations, we reverse and remand on all double benefit issues for further proceedings as stated in our conclusion at the close of this opinion.

**C.     Employer's Appeal: PPD Start-Date Issue**

**{39}** The WCJ recognized that Worker suffered problems with his low back, left hip, and right knee and determined that Worker reached MMI as to those injuries on January 2, 2014. The WCJ ultimately determined that Worker did not suffer "permanent physical impairment" for those injures. Further, the WCJ determined that Employer was entitled to credit for TTD benefits Employer paid during March 17, 2010 to January 2, 2014, at the same time determining that while Employer paid TTD payments to Worker through August 1, 2013, Employer had not paid such benefits or scheduled injury benefits since that date.

**{40}** The WCJ awarded PPD benefits "[f]rom January 2, 2014, and continuing for 500 weeks[.]" Employer contends that the WCJ compounded error "by restarting the 500 week PPD benefit period on January 2, 2014—the date . . . Worker's low back, left hip, and right knee injuries reached MMI." Employer shows that Worker suffered from low back, left hip, and depression (non-scheduled injuries) well before January 2, 2014, "[y]et, the WCJ did not give Employer . . . credit, as against the 500 week PPD benefit time period, for the TTD benefits . . . Employer . . . paid to . . . Worker

23

between March 17, 2010 and January 2, 2014." *See* § 52-1-42(B) ("If an injured worker receives temporary disability benefits prior to an award of [PPD] benefits, the maximum period for [PPD] benefits shall be reduced by the number of weeks the worker actually receives temporary disability benefits."). These are legal issues requiring our de novo review. *See Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 13, 137 N.M. 497, 113 P.3d 320 ("Appellate courts review matters of law de novo." (emphasis, internal quotation marks, and citation omitted)).

{41} Employer illustrates that within several months after March 17, 2010, Worker was complaining of low back, left hip, and right knee injuries and that Worker also later developed depression. Moreover, Employer adds, the WCJ determined that Worker's scheduled foot and ankle injuries reached MMI by June 13, 2012. Employer points out that "Worker experienced both scheduled and non-scheduled injuries from March 17, 2010 or shortly thereafter and that, at the very minimum, . . . Worker was being paid TTD benefits after March 17, 2010 for both scheduled and non-scheduled injuries." Moreover, Employer indicates that because Worker's foot and ankle injuries reached MMI by June 13, 2012, "any TTD benefits paid to . . . Worker after June 13, 2012 were not paid to . . . Worker because of those scheduled injuries."

{42} Employer sees this as similar to the issue addressed by this Court in *Gutierrez*, 2009-NMCA-106, ¶ 21, where this Court noted that, unlike in *Baca*, the worker's

24

back injury developed at the time of the accident and not years later. As in *Gutierrez*, Employer argues, "Worker's scheduled and non-scheduled injuries developed contemporaneously and shortly after . . . Worker's March 17, 2010 accident." As a result, Employer contends, "Worker was paid TTD benefits for both scheduled and non-scheduled injury benefits." Employer concludes that "the 500 week PPD benefit period provided by . . . [Section] 52-1-42(A)(2) . . . was triggered by . . . Worker's March 17, 2010 accident and not the date . . . Worker's last work related injuries reached MMI." Employer therefore argues that "the WCJ improperly restarted the 500 week PPD benefit period on January 2, 2014 after all of . . . Worker's work related injuries [had] reached MMI despite the fact that . . . Worker's entitlement to TTD benefits prior to January 2, 2014 was related, at least in part, to his non-scheduled injuries."

**{43}** Worker responds that the WCJ's decision to restart the 500 week period on January 2, 2014 was supported by *Baca*, 2002-NMCA-002, ¶ 1, which held that "the number of weeks [the w]orker received benefits for the disabilities caused by the scheduled injuries cannot be deducted from the number of weeks he is entitled to receive benefits for his [PPD]."

**{44}** Worker reiterates that he was injured on March 17, 2010; that "[t]he WCJ found that Worker's foot and ankle injuries reached MMI on June 13, 2012"; and that the

WCJ found that "Worker's low back, left hip and right knee injuries reached MMI on January 2, 2014." Injuries to the foot and ankle, Worker shows, are scheduled injuries listed in Section 52-1-43(A)(31) and (32), and an injury to the right knee is listed in Section 52-1-43(A)(30). Accordingly, Worker argues, he received TTD benefits for scheduled injuries from March 17, 2010 through January 2, 2014, and the award of 500 weeks of PPD benefits commencing on January 2, 2014 was fully supported by *Baca*, which stated that "[w]e see no reason to include the weeks of TTD received in connection with a scheduled injury in calculating the weeks that a worker may receive [PPD] benefits." 2002-NMCA-002, ¶ 25.

{45}     The WCJ determined that Worker was owed TTD benefits for various injuries from March 17, 2010 to January 2, 2014, with Employer entitled to a credit for TTD paid during that time period. The WCJ did not award scheduled injury or PPD benefits relating to the right knee. Yet the WCJ awarded PPD benefits "[f]rom January 2, 2014[] and continuing for 500 weeks[.]" Employer did not provide requested findings of fact or conclusions of law in regard to the start of the 500 week PPD benefit period. We have difficulty understanding Worker's emphasis on the right knee as a scheduled injury with a January 2, 2014 MMI date, as well as the WCJ's apparent agreement with Worker's position. We do not see any helpful findings, conclusions, or authorities set out by the WCJ in regard to the issues surrounding the start or restart

26

date, including, if pertinent, payment (or non-payment) and credit for TTD benefits, MMI dates, and scheduled and non-scheduled injuries that had or would have effect on the start or restart date.

{46} Presently, we are not in a position to provide effective review. We see this issue as one requiring reversal and remand for further proceedings as stated in the conclusion at the close of this opinion.

## D. Worker's Cross-Appeal: Assessment/Valuation Error

{47} Worker's cross-appeal presents a number of issues involving assessments or ratings of Worker's impairments. In regard to those issues, Worker repeats his position taken in regard to Employer's appeal that we are to liberally construe the Act. Employer has the same response as that expressed in its appeal. We continue to stand by our previous analysis. *See supra* ¶¶ 6-9.

## 1. Whole-Person Impairment

{48} Worker sees incongruity created by the impairment report of Dr. Reeve, who was the physician evaluating Worker's impairment. Worker asserts that the report indicates he was "unable to work in any reasonable occupation," yet under the Act he cannot qualify for permanent total disability and must live with a lesser right to PPD under Section 52-1-26(B). Notwithstanding that incongruity, Worker assures us that, as the law and process presently stand, impairment and disability are to be measured

under Section 52-1-24(A) by reference to the American Medical Association's *Guides to the Evaluation of Permanent Impairment*. *See* § 52-1-24(A) (defining "impairment" by reference to "the most recent edition of the American [M]edical [A]ssociation's [G]uide[s] to the [E]valuation of [P]ermanent [I]mpairment or comparable publications of the American [M]edical [A]ssociation"). And further, Worker acknowledges that working within the flexibility of the *Guides*, when there exists conflicting evidence as to impairment, the WCJ is to determine "the degree of a worker's impairment and disability[.]" *Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 19, 122 N.M. 524, 928 P.2d 250; *see id.* (stating that Section 52-1-24(A) "does allow for an element of discretion" and that "the [American Medical Association] Guide . . . was not intended to establish a rigid formula to be followed in determining the percentage of a worker's impairment").

{49}     Worker clarifies that his appellate point is limited to a disagreement with Dr. Reeve's assessment of his 26% WPI rating. While Worker acknowledges that Dr. Reeve accurately assessed a 30% lower extremity impairment (LEI) for each of the two foot/ankle conditions, Worker contends that it was error to convert each impairment rating to only an 8% WPI rating. Worker argues that Dr. Reeve erred mathematically in applying the conversion factor in Table 16-10 of the *Guides* by not converting each 30% rating to a 12% WPI as directed in the table. According to

28

Worker, the WCJ erred by failing to correct Dr. Reeve's mathematical error. Worker sees the issue as one of law, requiring de novo review.

{50} In a more detailed analysis, Worker contends that Dr. Reeve's ultimate combined WPI, which Worker sets out as 8+8+3+10 (8% LEI, 8% LEI, 3% altered gait, 10% depression), should have been 12+12+3+10—the former resulting in a mathematically incorrect "combined" 26% WPI under the "Combined Values Chart" in the *Guides* instead of the mathematically accurate 33% WPI impairment. According to Worker (as we understand it), the specific mistake that Dr. Reeve made was in the combined values process when he multiplied "the 30% LEI by 70% and then by 40% to arrive at only an 8% WPI[,]" instead of multiplying 30% LEI by 40% to arrive at a 12% WPI resulting in "two 12% WPI ratings [that] 'combine' into a 23% WPI [.12 + (.12)(.88) = .23]." "Had Dr. Reeve accurately converted his 30% LEI to 12% WPI," by correctly using the *Guides*, Worker states, "the final combined rating would have been a 33% WPI[,]" thereby substantially increasing Worker's benefits.

{51} Employer does not engage in a mathematical discussion to contest Worker's calculations. Employer insists that we must engage in whole record review. Employer contends that "Dr. Reeve's impairment report provides substantial evidence that supports the WCJ's determination in regard to this issue[.]" Employer argues that the WCJ made his decision regarding WPI conversion for each foot/ankle injury after

29

reviewing and considering conflicting evidence. Employer asserts that "a careful review of . . . Dr. Reeve's deposition . . ., when considered as a whole, demonstrate[s] that Dr. Reeve's testimony was tentative, hesitant and conflicting." Employer adds that "it appeared as if Dr. Reeve was uncomfortable with Worker's counsel's approach to and interpretation of the pertinent provisions of the . . . *Guides*."

{52}     To illustrate, Employer states that Dr. Reeve was asked the following questions and gave the following answers.

> Q.     So a 30% [LEI], wouldn't that be a 12% [WPI]? [(Objection omitted.)]
>
> A.     I think I have to look at the table. We use the table to do the conversion. I don't do it like—if the table shows—what does the table show?
>
>      . . . .
>
> Q.     But I just want to verify from the record, from the Table 16-2, what the impairment is to the lower extremity of 30%, and that converts to 12% [WPI]. [(Objection omitted.)]
>
> A.     That would be that. If we're doing that, we're incorporating the entire lower extremity, not just the ankle and the foot. Agreed?
>
> Q.     No. For that condition, that's what the rating is.
>
> A.     Right, but what I'm saying is that would include the hip and the knee then, because now it's the whole lower extremity converts to 8. But if you're doing it by the ankle, then this is correct.
>
>      In other words, . . . if you consider this an ankle to lower extremity whole body, then that'll be an 8%, and then if we're going to break out

the knee and hip again, that would be incorporated in the total 30%. Agreed?

. . . .

    Q.    And in this case you used the ankle and the foot injuries that you impaired to come up with an 8% [WPI] for each lower extremity?

    A.    Yes.

. . . .

    Q.    Well, 12% [WPI] rating as a result of each subtalar arthrodesis? [(Objection omitted.)]

. . . .

    A.    Well, I think the point I'm trying to make is this is a left and a right subtalar arthrodesis, which is ankle and foot, so the rating that it should have been given would have been—I guess it would depend on what we started with. If, indeed, we started with a 30% foot and ankle rating, right, then the whole body would have been 8%.

Employer concludes from the foregoing that "Dr. Reeve was confused and his testimony was conflicting and equivocal[.]"

{53} Worker's reply brief accuses Employer of "repetitious and misleading 'substantial evidence' arguments" and that a de novo standard of review "should be applied when reviewing a WCJ's interpretation of statutory requirements." Worker repeats his stance and accuses Employer of "completely mislead[ing] this Court by arguing that this is an issue of substantial evidence[] and that substantial evidence supports the WCJ's finding." Worker states:

31

This is simple mathematics: 30% x 40% = 12%! Simple math provides precise sums. It is preposterous to argue that substantial evidence supports an incorrect mathematical answer. Had Dr. Reeve added 2 + 2 and found 3; and had the WCJ accepted his sum, the Answer Brief would likewise argue that substantial evidence supports the conclusion that 2 + 2 = 3.

**2.      Lumbar Spine/Low Back**

{54}    As a separate assessment issue, Worker asserts that the WCJ erred as a matter of law by failing to find a permanent impairment of his low back, based on what Worker contends are "Dr. Reeve's verifiable findings of injury and Table 17-4 of the *Guides*."

{55}    In his cross-appeal brief in chief, Worker alleges that Dr. Reeve testified that Worker's "complaint of low back pain radiating down from his left buttock to the heel of his foot was consistent with a '[disk] protrusion at L5-S1' and that Worker had 'verifiable findings' of a lumbar injury." Worker adds that Dr. Reeve's testimony was that "a 7% WPI was an appropriate rating for this injury pursuant to Class 1 within Table 17-4[.]" Worker states that, on cross-examination, "Dr. Reeve admitted that he did not assign a lumbar impairment at the time of his evaluation." Thus Worker asserts that "the WCJ erred as a matter of law by failing to find a permanent impairment of his lumbar spine, based upon Dr. Reeve's verifiable findings of injury and Table 17-4 of the *Guides*."

32

{56} Worker considerably expands his brief in chief argument in his reply brief. He asserts that the following were undisputed facts. According to Worker, "Dr. Reeve's physical examination of Worker's lumbar spine revealed tenderness over the lower lumbar area, pain to palpation, and mild restricted range of motion[,]" and Worker was referred for physical therapy. Worker states that an MRI showed a "small [disk] protrusion at L5-S1[.]" Dr. Reeve testified that Worker "has a verifiable finding" related to his lumbar injury and assessed Worker as suffering from "chronic low back pain[,]" and when asked to assess impairment for Worker's lumbar spine, Dr. Reeve testified that Worker "would fall into the Class I, intervertebral [disk] herniation at a single level with medically documented findings with or without surgery. So the default level would be seven." Dr. Reeve also testified that he would be comfortable with assigning a 7% WPI rating due to the lumbar injury.

{57} Asserting that he suffered a lumbar disk protrusion or herniation, Worker notes that Table 17-4 of the *Guides*, in its "Lumbar Spine Regional Grid," indicates that with an "intervertebral disk herniation, Class 1 provides [a] WPI rating[] in the range of 5% to 9%, with 7% being the default rating[] for a single level herniation with medically documented findings; with or without surgery." He cites Stedman's *Medical Dictionary* 790 (26th ed.), as defining "herniation" as "formation of a protrusion[,]"

33

and he notes that Dr. Reeve agreed that the terms "herniation" and "protrusion" are equivalent.

{58} For support Employer looks to other testimony of Dr. Reeve from which Employer argues that Dr. Reeve's impairment report on this subject and the WCJ's determination that Worker's lumbar injury was not a permanent impairment were supported by the evidence. As mentioned earlier, Employer insists on a whole record review. Employer suggests that Worker presents a "substantial evidence motif without calling it substantial evidence" and states that "the fallacy" of Worker's position is that "it focuses only on the evidence that supports [his] position and not all of the pertinent evidence." Employer cautions that the reviewing court is to canvass all the evidence bearing on a finding or decision, favorable and unfavorable, in order to determine if there is substantial evidence to support the result, not substitute its judgment for that of the administrative agency, but instead view all evidence in the light most favorable to the agency's decision. Thus, Employer reminds us we are to affirm the WCJ's decision if, after taking the entire record into consideration, "there is evidence for a reasonable mind to accept as adequate to support the conclusion reached." *Leonard*, 2007-NMCA-128, ¶ 10 (internal quotation marks and citation omitted).

34

**{59}** Employer notes that Dr. Reeve diagnosed chronic low back pain for Worker's low back complaints, "not . . . a herniated [disk] or, importantly, a radiculopathy for purposes of the impairment evaluation." Employer highlights "additional pertinent aspects" of Dr. Reeve's deposition testimony.

> Q. Okay. You stated that the MRI revealed a herniated [disk] at L5-S1?
>
> A. Yes. He doesn't actually have a herniated [disk]. He has a [disk] protrusion at L5-S1. It's not a clear herniated [disk], as I recall. I think he has a verifiable finding, yes.
>
> . . . .
>
> Q. You did not even diagnose a chronic low-back pain with nonverifiable radicular complaints?
>
> A. No.
>
> . . . .
>
> Q. So at the time of the impairment rating, and you haven't done any additional work since then, your opinion is—or you have not assigned an impairment rating to [Worker's] low back?
>
> A. Yes, that's correct.
>
> . . . .
>
> Q. We can engage in a lot of speculation and conjecture about what might be going on with [Worker], but your best medical judgment at the time you did the impairment rating here today is no impairment for the low back?
>
> A. Yes.

Q. And that's based upon a reasonable degree of medical probability? [(Objection omitted.)]

A. Yes.

{60} Based on Dr. Reeve's impairment report and testimony, Employer asserts that substantial evidence exists supporting the WCJ's determination that "Worker did not suffer a permanent impairment to his low back as a result of his March 17, 2010 accident."

{61} In his reply brief, Worker accuses Employer of turning to whole record review in an "attempt[] to distort reality by arguing that Dr. Reeve's testimony was equivocal and therefore Worker's L5-S1 [disk] herniation (and its impairment value) does not exist." Worker nevertheless requests this Court, if it is to apply whole record review, to "find" the following facts about the low back impairment:

(1) Worker has a documented [disk] protrusion at L5-S1;

(2) A [disk] protrusion is an anatomical abnormality;

(3) Worker has chronic low back pain and verifiable findings relating to the [disk] protrusion;

(4) Dr. Reeve omitted a lumbar assessment during his initial impairment assessment;

(5) Asked to assess impairment for the lumbar injury during his testimony, Dr. Reeve readily agreed that a 7% WPI would be appropriate;

(6) A 7% WPI is in the range of WPIs for a "disk herniation . . . at a single level . . . with medically documented findings" pursuant to Class 1 on Table 17-4 of the Lumbar Spine Regional Grid;

(7) Dr. Reeve testified during cross-examination that he would **not** agree that "[Worker] merits a zero percent impairment for his low back"; . . .

(8) Dr. Reeve's answer, in response to very confusing questions posed during cross-examination, was that he had not assigned a lumbar impairment at the time of his initial impairment assessment[.]

{62} Thus, Worker argues, even under whole record review, this Court should conclude that the WCJ erred by finding that Worker did not suffer a permanent impairment to his low back, because "[t]he only logical conclusion from the evidence presented is that Worker was entitled to an impairment rating for his lumbar injury."

**3. Hips**

{63} For his final assessment issue, Worker contends that "the WCJ erred as a matter of law by failing to find a permanent impairment to his hips, based upon Dr. Reeve's and the [independent medical examination] physician's verifiable findings of injury and Table 16-4 of the *Guides*." Worker asserts that Dr. Reeve's testimony showed that Worker suffers from bilateral hip pain, diagnosed as "trochanteric bursitis." He states that the evidence of bilateral hip pain and the bilateral trochanteric bursitis was undisputed. And he points out that Table 16-4 of the *Guides* provides an impairment rating for "chronic trochanteric bursitis with documented, chronically abnormal

37

gait[,]" with a default rating of "7% LEI, which converts to a 3% WPI [7% x 40% = 3%]."

{64} Employer asserts that Worker's challenge of the WCJ's determination involves an issue of substantial evidence and that Worker "focuses mostly on the evidence that would support the result [he] seeks[, thereby] essentially requesting that this Court sit as the trial judge and reweigh the evidence to resolve this issue in favor of . . . Worker."

{65} Employer again turns to Dr. Reeve's impairment report and testimony. Employer shows that, in his impairment report, Dr. Reeve diagnosed "chronic bilateral hip pain[,]" not the "bursitis" referenced by Worker. Further, Employer highlights that Dr. Reeve testified as follows:

> Q.     Now, in terms of the hip, you also, on January 2, 2014,
> diagnosed bilateral hip impairment?
>
> A.     Yes.
>
> . . . .
>
> Q.     Without a bursitis there's no basis to assign an impairment
> rating to [Worker's] left hip?
>
> A.     Yes.
>
> Q.     And you agree with that?
>
> A.     Yes.

Q. And that's based upon a reasonable degree of medical probability? [(Objection omitted.)]

A. Yes.

. . . .

Q. I understand. All I'm trying to establish, Dr. Reeve, is if we look at Table 16-4, and the diagnosis is left hip pain, if the diagnosis is left hip pain then he fits into a class zero, and that means a zero percent impairment.

A. Well, if you just go with a diagnosis of hip pain, but if you go with the diagnosis of bursitis, he would have some form of—he could have a formal impairment rating.

Q. And that's based upon a reasonable degree of medical probability? [(Objection omitted.)]

A. Yes.

Q. And you have the same answer for the right hip?

A. Yes.

Q. Based upon a reasonable degree of medical probability?

A. Yes.

Employer asserts that "[u]nquestionably, Dr. Reeve's testimony about whether . . . Worker suffered an impairment to his hips as a result of his March 17, 2010 accident was conflicting and, at times, confusing and was largely dependent on what assumptions Dr. Reeve was asked to make." While Dr. Reeve's testimony may have also supported the conclusion Worker seeks, Employer adds, "as with the other

39

substantial evidence questions raised by this appeal, this Court's function is not to reweigh the evidence even if it believes that the WCJ could have reached a different result." Employer concludes that the evidence "demonstrates that the WCJ's determination that . . . Worker did not suffer an impairment to his hips as a result of his March 17, 2010 accident is supported by substantial evidence and should not be disturbed."

{66} Worker, of course, responds with what he asserts is undisputed evidence that he suffers from bilateral hip pain as a result of the work accident and that his bilateral hip injuries were diagnosed as bilateral "trochanteric bursitis." Worker then returns to the *Guides* as providing an impairment rating for "chronic trochanteric bursitis with documented, chronically abnormal gait." Worker argues it was undisputed that he has a documented, chronically abnormal gait. Worker asserts that "[t]he default rating for this diagnosed hip condition is a 7% LEI, which converts to a 3% WPI [7% x 40% = 3%]" and that "Dr. Reeve agreed that two 3% WPI ratings were appropriate for Worker's bilateral trochanteric bursitis at the hips."

{67} With this evidence, Worker asserts that Employer once "again attempts to distort reality by arguing that Dr. Reeve's testimony was 'conflicting' and 'confusing'; and therefore Worker's bilateral trochanteric bursitis (and impairment values) does not exist." Worker accuses Employer of "attempt[ing] to manufacture

40

'conflicting' evidence by arguing that if Worker's hip injuries were not diagnosed as trochanteric bursitis then there would be no ratable impairments."

{68} Thus, Worker asserts that "[t]he WCJ erred as a matter of law by failing to find permanent impairments [under Section 52-1-24(A)] to both of Worker's hips, based upon the verifiable findings of injury made by Dr. Reeve and the [independent medical examination] physician[], and Table 16-4 of the *Guides*."

{69} He contends that "the whole record demonstrates that [he] was not correctly assigned a 12% WPI for each foot/ankle injury; and was not properly assigned impairments for his lumbar and hip injuries." And he concludes that

> [a] correct interpretation of [Section] 52-1-24(A) and the . . . *Guides* require findings that Worker has a 12% WPI due to his right LEI; a 12% WPI due to his left LEI; a 10% WPI for depression; a 7% WPI for his lumbar [disk] protrusion with medically documented findings; a 3% WPI due to trochanteric bursitis in his right hip; a 3% WPI due to trochanteric bursitis in his left hip; and a 3% WPI due to chronic pain.

**4.    Summary of Assessment and Valuation Issues**

{70} Worker raises issues in need of considerably more detailed and transparent analysis, explanation, and authority contained in findings of fact and conclusions of law or in an explanatory decision before we attempt to resolve the issues through effective appellate review. We therefore reverse and remand to the WCJ for further proceedings as stated in our conclusion at the close of this opinion.

**E.    Worker's Cross-Appeal: Combined Values/Additive Value Issues**

{71}     Worker describes the "combined values" method in the *Guides* for combining multiple impairment ratings. He then takes us through a complicated arithmetic analysis, which, he obviously assumes, this Court will easily and undoubtedly follow, and which we set out here verbatim.

> Worker's WPI impairment ratings "add" up to at least a 50% WPI, to wit: 12+12=24; +10=34; +7=41; +3=44; +3=47; +3=50. Pursuant to the "Combined Values Chart" . . . of the *Guides*, these very same impairment ratings "combine" into a 42% WPI, to wit: 12+12(88%)=23; +10(77%)=31; +7(69%)=36; +3(64%)=38%; +3(62%)=40%; +3(60%)=42.

> At $666.02 per week, a 1% change in PPD benefits will reduce benefits by $6.66 per week, or by $3,330.10 over 500 weeks. An 8% loss in the WPI rating is $26,640.80 less in PPD benefits over 500 weeks.

{72}     Stated slightly differently, Worker explains that "the seven impairment values that [he] is requesting on appeal 'add' up to 50% and 'combine' to 42%. This 8% difference would increase [Worker's PPD] benefits by $53.28/week ($666.02/week x 8%)." Relying on a 2000 article in the *Journal of the American Medical Association* entitled *Recommendations to Guide Revision of the Guides to the Evaluation of Permanent Impairment*, Worker also sets out "numerous criticisms" of the *Guides* in devaluing disability assessments. Stating that it is a matter of first impression, Worker argues from the article that the "combined values" method utilized by the *Guides* "almost always results in a 'less than additive' value whenever the sum of two impairments of at least 5% exceeds 15%[] and only results in the 'additive' value

42

whenever one impairment is small or the sum is about 15% or less." Worker concludes that "[t]his 'combined values' or 'less than additive' method of compensating a disabled worker with multiple impairments was not specifically approved by the Legislature, is fundamentally unfair to disabled workers with multiple impairments, and denies workers with substantial and multiple impairments equal protection under the . . . Act."

{73} Not ending on that note, Worker points to "impairment" in Section 52-1-24 as being referenced throughout "singularly" and further points to NMSA 1978, Section 12-2A-5(A) (1997)'s provision that "[u]se of the singular number includes the plural, and use of the plural number includes the singular[,]" in arguing that he "should be compensated for PPD at a rating equal to his impairments, rather than the less than additive value, plus modifier values." Setting out examples related to disability benefits set out in Section 52-1-25, NMSA 1978, Section 52-1-41(B) (1999, amended 2015), and Section 52-1-42(A)(2) to show his point, and adding arguments on the topic, Worker concludes that "[l]ogic and reason dictate that the Legislature would likewise have intended to fully compensate disabled workers with multiple and substantial impairment ratings the full additive value of their impairments, rather than a less than additive value."

{74} And as Worker "finally" asserts under this point, an interpretation of Sections 52-1-24 and -26 that would create two classes of individuals, namely: "(1) those with single and/or minor impairment ratings who receive full value for PPD benefits; and (2) those with multiple impairment ratings who receive 'less than additive value' for PPD benefits[,] would violate the [E]qual [P]rotection [C]lause of the New Mexico Constitution, Article II, [Section] 18[,]" because no rational basis exists "for discriminating against workers who have multiple impairments and have a greater need for full benefits."

{75} Since it was undisputed that Worker was totally and physically unable to return to work in his chosen career as a plumber, because he does not qualify for permanent total disability benefits due to the severely restrictive definitions in Section 52-1-25, and because he is not entitled to any vocational assistance or rehabilitation due to the repeal of those benefits in 1990, Worker concludes that:

> The plain language of [Section] 52-1-24 and [Section] 52-1-26[,] the legislative intent to provide greater disability benefits to [w]orker[s] with severe, multiple and/or higher impairment ratings[,] and the spirit of the Act[] mandate an award of PPD benefits to Worker based upon the full extent of his injuries and his impairments. The WCJ erred by 'combining' Worker's impairments at a less than additive value.

{76} Employer responds that Worker wants this Court to "interject itself as a super legislature and redefine" the definition of "impairment" in Section 52-1-24(A). In that regard, Employer notes that Worker "acknowledges that this issue is a matter of first

44

impression 'and [is] without prior case law guidance' " and fails to supply authorities that support "his argument that this Court should summarily disband the 'Combined Values' methodology outlined in the . . . *Guides* in addressing workers' compensation cases in New Mexico contrary to what Section 52-1-24(A) provides." Employer notes Worker's lack of authority supporting his position, stating that Worker's argument "is supported mostly by Worker's self-interest and inclination that the Legislature surely did not intend to adopt the 'Combined Values' approach." Employer sets out several arguments as to why Worker's arguments fail, including Worker's equal protection violation arguments.

**{77}** We view the issues here as policy-based, with answers not apparent from the statutes. For effective review, we reverse and remand for further proceedings as stated in our conclusion at the close of this opinion.

**F.      Tort Damages Value/Employer's Reimbursement Right**

**{78}** Worker attacks the WCJ's $3,300,000 assessment of the value of Worker's case, as well as the WCJ's finding that follows from that assessment that Worker received 56% ($1.85 million) of the amount needed to make Worker whole. Worker asserts that the WCJ erred as a matter of law by not apportioning Worker's tort recovery into any elements, as required in *Gutierrez v. City of Albuquerque*, 1998-NMSC-027, ¶ 14, 125 N.M. 643, 964 P.2d 807. Rather, in Worker's words, the WCJ

"simply knocked $1 million off of Worker's valuation without any analysis other than Worker's tort attorney remained his advocate."

{79} Worker faults the WCJ for not accepting what Worker contends is "the reasonable and conservative valuation of Worker's tort damages [of $4,300,000] that were made by Worker's experts, his tort attorney, economist and certified life planner[,]" a valuation that, Worker asserts, Employer did not rebut or offer any contrary expert opinion. Worker asserts that Employer offered no evidence as to the value of Worker's tort damages and did not dispute his showing of the specific elements comprising the value of those damages, presented as follows:

| | Elements of Damage | Value | % of claim |
|---|---|---|---|
| 1. | Payment Medical Expenses | $ 122,000 | 2.8% |
| 2. | Past Lost Earnings | $ 208,000 | 4.8% |
| 3. | Past Loss of Household Services | $ 15,000 | 0.3% |
| 4. | Future Loss of Household Services | $ 202,000 | 4.7% |
| 5. | Future Medical Expenses | $ 221,000 | 5.1% |
| 6. | Future Lost Earnings | $1,907,000 | 44.4% |
| 7. | Pain and Suffering | $ 750,000 | 17.4% |
| 8. | Loss of Enjoyment of Life | $ 650,000 | 15.2% |
| 9. | Loss of Consortium ([wife's] case) | $ 225,000 | 5.2% |

*Total Case Value* $4,300,000 100%

*Gutierrez* held, among other things, that:

> The employer is entitled to only that part of the tort recovery which represents monies paid that *duplicate* compensation it has paid or is liable to pay. The judge must start from the presumption that the employer is entitled to full reimbursement, because, as we said in *Montoya*, if the worker has dealt with the third party in good faith and at arm's length, then the net amount paid presumptively would be the amount by which the employer's liability is reduced. However, a worker who has resolved [his] third-party suit can no longer be said, as a *matter of law*, to have been made financially whole. A worker must be given the opportunity to show, and has the burden to prove, that *in fact* the tort recovery was fairly and reasonably calculated in good faith to compensate for injuries not covered by the benefits the employer has paid. If a worker does so, the [WCJ] must apportion a worker's tort recovery into its reasonable elements, and compare those with a breakdown of the compensation benefits paid by employer. An employer has an interest in those elements of the worker's tort recovery which are also covered by worker[s'] compensation, but no interest in those elements of a worker's tort recovery that were calculated in good faith to remedy losses not covered.

1998-NMSC-027, ¶ 14 (internal quotation marks and citations omitted). Worker contends that these damages calculations were based on uncontradicted medical evidence that the WCJ should have accepted under the "uncontradicted medical evidence rule." *See Hernandez v. Mead Foods, Inc.*, 1986-NMCA-020, ¶¶ 13-14, 104 N.M. 67, 716 P.2d 645 (establishing that uncontradicted medical evidence must be accepted under certain circumstances). Worker asserts he produced uncontradicted evidence of the value of his tort damages pursuant to NMSA 1978, Section 52-5-17

47

(1990), and *Gutierrez*, none of which was rebutted or shown to be unworthy of belief, equivocal, suspicious, or subject to any reasonable doubt as to veracity. Based on various explanations, including various damages amounts and descriptions of Worker's condition and economic status, Worker concludes that, with no findings of fact, it was absurd that the WCJ could "summarily discount the valuation of such tort damages by attorneys who for decades have routinely obtained such damages for their clients."

{80}     Employer argues that Worker seeks nothing more than to have this Court reweigh the evidence in a substantial evidence challenge. Employer points out that Worker's evidence was "supported mostly by the 'expert' testimony of the attorney who represented . . . Worker in his tort litigation[,]" testimony to which Employer states it had objected. In addition, Employer points to evidence it presented through its examinations of Worker, his wife, and his tort attorney regarding "the impact the . . . accident had on . . . Worker[,]" and points to the fact that the WCJ heard testimony from Worker about his pain and suffering, loss of enjoyment of life, and overall impact of his injuries. In some detail, Employer's answer brief explained:

> Putting aside Worker's almost exclusive reliance on the testimony of his tort attorney, the record reflects that the WCJ's decision about the value of the Worker's tort claim is supported by substantial evidence which Worker's [brief in chief] seems to acknowledge. Worker's valuation of his lost earnings, household services and medical expenses, past and future, were fully supported by the facts and expert opinions of the

48

economist and certified life planner. These damages totaled $2.675 million. If the WCJ accepted these amounts, that left only $625,000 for past and future pain and suffering, past and future loss of enjoyment of life and loss of consortium for Worker's spouse. This amount is less than 39% of the conservative valuations made by Worker[] by Worker['s] tort attorneys. In other words, assuming the WCJ's[] $3.3 million valuation of . . . Worker's tort damages, Worker concedes that an amount of $625,000 would remain for the hedonic portion of . . . Worker's tort damages—something that is most certainly reasonable.

(Internal quotation marks and citation omitted.)

{81} The WCJ's valuation lacks the analytic detail and transparency as to the factors that support his valuation. Without that, the WCJ's valuation appears as little more than guesswork and is inadequate for effective review. We reverse and remand for further proceedings as stated in our conclusion at the close of this opinion.

**CONCLUSION**

{82} We reverse and remand on all issues with instructions to the WCJ to assess his previous determinations and rulings based upon the analysis set forth in this opinion. Thereafter, the WCJ should provide detailed, reasoned analyses, explanations, transparency, and authorities as to each disposition on each issue to be contained either in amended or additional findings of fact and conclusions of law or in a supportive and fully explanatory decision, or both, as best suits the WCJ to produce final determinations that are amenable to effective appellate review.

{83} **IT IS SO ORDERED.**

49

                _____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge**

**STEPHEN G. FRENCH, Judge (specially concurring).**

**FRENCH, Judge (specially concurring).**

{84}  I concur with the majority's position and offer additional thoughts I believe will assist the WCJ and counsel on remand.

{85}  Neither *Gutierrez*, *Baca*, nor relevant earlier decisions, directly address the precise question of whether a worker can receive scheduled injury benefits for loss of use *and* PPD benefits, in addition to loss of use, for the same scheduled body member injury. Although instructive, *Gutierrez* and *Baca* do not directly address and answer that question here. It is my view that compensation benefits for PPD pursuant to Section 52-1-42 (non-scheduled injury) may never be based upon an accidental injury to the same specific body member separately covered by Section 52-1-43 (scheduled injury).

{86}  This is so because the statute providing for compensation benefits for PPD, Section 52-1-42, states that benefits may be available for injuries "not specifically provided for in Section 52-1-43[.]" As this Court in *Baca* concluded, "disabilities caused by scheduled injuries and disabilities caused by injuries to non-scheduled members are separate and distinct concepts." 2002-NMCA-002, ¶ 21; s*ee id.* (holding that "a worker was entitled to [PPD] benefits instead of scheduled injury benefits if the worker could show that the injury to the scheduled member *caused a separate and distinct injury* to a non-scheduled body part" (emphasis added)). Thus, the touchstone

for receiving both PPD benefits, in addition to scheduled injury benefits, is the requirement of a separate and distinct injury to a non-scheduled body part different from that of a separate and distinct scheduled member injury. Here, it appears that the WCJ compensated the *same* scheduled injuries, Worker's left foot/ankle injury and Worker's right foot/ankle injury, with both PPD benefits and scheduled injury benefits. *See* § 52-1-43(A)(31). In my view, this is improper.

_____

**STEPHEN G. FRENCH, Judge**